**CITIES SERVICE COMPANY, Plaintiff,**
v.
**UNITED STATES of America, Defendant.**
No. 67 Civ. 4606.

United States District Court,
S. D. New York.
July 23, 1970.

Robert J. Casey, New York City, for plaintiff; Thomas E. Tyre, John A. Craig, John K. Antholis, Casey, Tyre, Wallace & Bannerman, James W. Robinson, Frueauff, Farrell, Sullivan & Bryan, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., S. D. New York, by Brian J. Gallagher, Asst. U. S. Atty., New York City, for defendant.

MANSFIELD, District Judge.

In this action brought pursuant to 26 U.S.C. § 7422 and 28 U.S.C. § 1346(a)

for the refund of taxes paid during the taxable years 1953 and 1954, defendant United States has moved for summary judgment. Plaintiff counters that there are fundamental unresolved issues of fact requiring denial of the motion, and argues in the alternative that if summary judgment is to be granted, it must be granted in plaintiff's favor. For reasons discussed in detail below, we deny both motions but conclude pursuant to Rule 56(c) and (d) that no genuine issues exist as to plaintiff's claim except as indicated.

The action arises out of plaintiff's issuance in 1947 of $115,246,950 in 3% thirty-year sinking fund debentures in exchange for its then outstanding preferred and preference stock. Plaintiff contends that the debentures were issued for a consideration amounting to less than their face value. More specifically it claims that its preferred and preference shares received in exchange were worth substantially less than the face amount of the debentures.

In 1953 and 1954 plaintiff repurchased certain of the debentures. It contends that these purchases resulted in losses to it which were deductible pursuant to § 165(a) of the Internal Revenue Code.[1] Furthermore, on the theory that the debentures were issued at a discount in 1947 it claims the right to deduct annually an amortized percentage of the discount over the life of the debentures pursuant to Internal Revenue Regulation § 1.61–12, the relevant portion of which provides:

"* * * If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds. If the corporation purchases any of such bonds at a price in excess of the issuing price plus any amount of discount already deducted, the excess of the purchase price over the issuing price plus any amount of discount already deducted (or over the face value minus any amount of discount not yet deducted) is a deductible expense for the taxable year. * * *"[2]

Defendant contends that the consideration received by plaintiff upon issuance of the debentures was exactly equal to their face amount, and that since defendant received "equal for equal" no loss was sustained. Furthermore, defendant argues that even if there was a differential between the face amount of the debentures and the consideration received, it would not amount to a deductible "discount" within the meaning of the above-quoted regulation.

*Background*

In late January, 1941, plaintiff Cities Service became a registered holding company under the Public Utility Holding Company Act of 1935, thereby subjecting itself to special regulation by the Securities and Exchange Commission. Pursuant to that Act and to various orders issued by the SEC, Cities Service was required to divest itself of certain of its public utility interests and to undertake a simplification of its corporate and capital structures.

Accordingly, on November 20, 1946, Cities Service presented a "Plan pursuant to Section 11(e) of Public Utility Holding Company Act of 1935 for simplification of corporate structure" to its shareholders and to the SEC. At the time of the submission of this original plan Cities Service had outstanding, in addition to slightly over 100 million dollars in debentures and about 37 million dollars par value of common stock, three classes of no par voting cumulative preferred and preference stock whose stated value aggregated about 58.7 million dollars. The dividends on these three classes of preferred stock had been passed for 14 years, and the arrearages totalled approximately 49.7 million dollars.

---

1. *"General Rule.*—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise."

2. Regulation § 1.61–12 is, in all pertinent respects, substantially identical to its predecessor under the 1939 Code.

The plan submitted provided for prompt cash redemption of the outstanding debentures, and for the exchange of the preferred and preference stocks for an issue of 3% fifty-year sinking fund debentures in an amount equal to the stated value of the preferred and preference shares plus accumulated and unpaid dividends, or approximately 108.4 million dollars. The plan further provided that approval of the exchange by the holders of 60% of the preferred shares would be required before the plan would become effective.

Beginning in December, 1946, and continuing for some months thereafter, the SEC conducted hearings on the fairness of the plan. On the opening day of the hearings objections to the plan were raised by various preferred shareholders. They pointed out that while debenture holders, upon retirement of their securities, were being given their full call price in cash, the preferreds were to receive only the liquidation value of their shares, and even that in the form of securities which could not be expected to sell at par under prevailing market conditions. Cities Service's earnings, they argued, had long been and would continue to be sufficient to pay dividends on the preferred if the management would only forego its established policy of using all surplus earnings to retire debt. Under the circumstances, they contended, Cities Service should pay the full call price of the preferred shares as well as that of the outstanding debentures to be retired. It was also suggested that the interest rate on the debentures to be issued in exchange for the preferred stock be raised to 3½%, presumably to increase the chances that the debentures could be sold at par.

On February 14, 1947, after extensive testimony by Cities Service executives, engineers and investment bankers as to the fairness of the proposed plan, and shortly before a preferred shareholders' committee was to proceed with its opposing proof, Cities Service amended its plan to meet the objections of the preferred shareholders. The amended plan

reduced the maturity of the 3% debentures from fifty to thirty years, awarded the preferred stockholders debentures in a principal amount equal to the call premium on their shares plus their stated value and dividend arrearages, dispensed with the necessity of stockholder approval of the exchange, and restricted the rights of Cities Service to declare common stock dividends and to incur new debt during the life of the debenture issue.

The preferred shareholders thereupon withdrew their objections to the amended plan. On April 24, 1947, the amended plan was approved by the SEC. Three days later the United States District Court for the District of Delaware signed an order enforcing the plan, which thus became effective on May 27, 1947.

At the time the plan became effective, Cities Service had outstanding three separate classes of preferred and preference stock: (1) preferred stock, (2) preference B stock, and (3) preference BB stock.

The preferred class consisted of 560,600 shares of $6.00 cumulative preferred stock carrying an annual dividend of $6.00 and callable at plaintiff's option at any time at a price of $112.00 per share ($100.00 stated value plus $12.00 call premium) plus accumulated and unpaid dividends. As of May 27, 1947, each share of preferred was carrying $84.50 in accumulated and unpaid dividends. The redemption price for each share of preferred was thus $196.50 and the total redemption price for the 560,600 shares outstanding was $110,157,900.

The preference B class consisted of 86,000 shares of 60¢ cumulative no par stock carrying an annual dividend of 60¢ and callable at plaintiff's option at a price of $10.60 ($10.00 stated value plus 60¢ call premium) plus accumulated and unpaid dividends. As of May 27, 1947, each share of preference B stock was carrying $8.75 in accumulated but unpaid dividends. The redemption price for each share of preference B was thus

$19.35 and the total redemption price for the 86,000 shares outstanding was $1,664,100.

The preference BB class consisted of 17,700 shares of $6.00 cumulative no par shares carrying an annual dividend of $6.00 and callable at plaintiff's option at a price of $106.00 ($100.00 stated value plus $6.00 call premium) plus accumulated and unpaid dividends. As of May 27, 1947, each share of preference BB stock was carrying $87.50 in accumulated and unpaid dividends. The redemption price for each share of preference BB was thus $193.50 and the total redemption price for the 17,700 shares outstanding was $3,424,950.

On May 28, 1947, plaintiff issued its thirty-year 3% sinking fund debentures in the aggregate amount of $115,246,950 in exchange for all its outstanding preferred, preference B and preference BB shares, all rights appertaining thereto, and all dividend arrearages thereon. Each share of each class thus received precisely its call price in face amount of the new debentures in the exchange. By the terms of the indenture plaintiff was required to retire at least $1,500,000 in principal amount of debentures annually. Accordingly, during the taxable year 1953 it repurchased $1,519,500.00 face amount of debentures at an aggregate cost of $1,398,357.39, and during the taxable year 1954 purchased $1,805,900.00 face amount of debentures at an aggregate cost of $1,786,569.02.

Two other figures whose relevance will become apparent further on in this discussion are worthy ' of mention. Plaintiff Cities Service contends, and for purposes of this motion the United States is willing to concede, that the three classes of preferred and preference shares under discussion were originally issued by the plaintiff at various times in consideration for cash and properties having an aggregate fair market value at the time of issuance of no more than $45,323,846.00. Similarly the plaintiff contends, and defendant provisionally concedes for purposes of its motion, that at the time of the exchange in 1947 the aggregate fair market value of the preferred and preference shares was $86,313,600.00.

### Plaintiff's Theories of Recovery

Plaintiff advances two theories in support of its claim to a tax deduction arising' from its repurchase of debentures in 1953 and 1954. Both theories are based on plaintiff's contention that it paid more to redeem the debentures than it received in exchange for them upon issuance in 1947. What it received —the issue price of the debentures— plaintiff contends, was either the fair market value of the preferred and preference shares surrendered upon the 1947 exchange ($86,313,600.00), or the fair market value of the cash and properties originally paid in upon issuance of those shares in prior years ($45,323,846.00). The first theory holds simply that a deductible loss was realized upon repurchase of debentures at a price higher than the price realized upon their issuance. The second theory, based on Reg. § 1.61–12, holds that the issuance of the debentures at less than face in 1947 gave rise to bond "discount" within the meaning of that Regulation, entitling plaintiff to prorate or amortize the discount over the life of the bonds and to deduct both the amortization thereof for the taxable years in question and the unamortized portion of the discount attributable to the debentures retired in those years. Each theory produces two figures for the proposed deduction, depending on which of the two measures of the issue price of the debentures in 1947 is employed. See Complaint ¶¶ 35–39, 44–48.

Defendant's answer to both theories is the same: the debentures were in fact issued at face value. Hence no discount arose from the exchange, and since the consideration received for the debentures equalled their face value, no loss was sustained when plaintiff repurchased them at less than face in 1953 and 1954. Defendant also contends that even if the debentures were issued at less than face, the differential is not deductible discount.

*Discussion*

Three distinct questions are presented on this motion. *First*: Was the consideration received by Cities Service in exchange for the debentures issued in 1947 less than the face or principal amount of the debentures? *Second*: If so, does the difference give rise to a deductible loss or, in the alternative, to an amortizable discount within the purview of Reg. § 1.61–12? *Third*: How is the difference, if any, to be measured?

### Was the Consideration Received Less than the Face Amount of the Debentures?

At the outset we are confronted with the fact that the face amount of the debentures issued in 1947—$115,246,950—was identical with the cash amount that plaintiff would have been required to pay to the preference and preferred shareholders if it had chosen to redeem their shares. If it had redeemed the shares, the aggregate amounts paid out in cash would have been as follows:

| | |
|---|---|
| Stated value | $ 58,690,000 |
| Accrued undeclared cumulative dividends | 49,671,950 |
| Redemption premium | 6,885,000 |
| Redemption call price | $115,246,950 |

Seizing upon this identity of figures defendant contends that what really happened during the course of the hearings before the SEC was that plaintiff redeemed the preferred and preference shares, paying the full call price for them, albeit in the form of debentures rather than cash. According to defendant the issuance of the debentures and plaintiff's receipt of stock constituted the cancellation of concrete obligations totalling $115,246,950, and plaintiff's only real alternative would have been to issue debentures on the market and then redeem the preferred and preference shares by paying the full call price in cash to their holders. Instead plaintiff chose, in defendant's view, to pay off the shareholders in debt paper.

There are fatal flaws in defendant's position. In the first place, debentures are frequently not worth their face value in cash, particularly where the interest yield (here only 3%) compares unfavorably with the current market, in which event they can only be issued for a consideration less than their face value. Indeed plaintiff has offered abundant proof that here the actual value of the shares received in exchange for the debentures was substantially less than the redemption call price, and defendant has offered no contrary proof. For instance, the aggregate closing market price of the shares on the day before the exchange was $104,827,450. An expert appraisal of the shares, adjusted to eliminate the effects of the impending exchange, concludes that their inherent fair market value on May 27, 1947, was $86,313,600. Moreover, plaintiff, upon original issuance of the shares, received an aggregate of only $45,323,846 as against the much higher redemption call price. Lastly, between the time when the amended plan was proposed (after which investors could and would value the Cities Service preferred and preference stocks with reference to the securities for which they were soon to be exchanged) and the date of the exchange, plaintiff's preferred shares never sold at more than 91% of the face amount of the debentures they represented. On the date of their issue, furthermore, the debentures closed at 71⅞, their high for the day, and did not get above 93 for over two months. Thus all proof before us indicates that the shares were worth less than the face amount of the debentures issued.

Secondly, it is clear that the 1947 exchange did not constitute a redemption. Under the terms of plaintiff's charter a redemption would occur only if plaintiff voluntarily and unilaterally retired its shares by payment of the agreed-upon redemption call price in cash to the shareholders, in which event the latter had no alternative but to accept the cash redemption call price. (Def's Ex. D, Section Fourth, ¶ 7). No cash was paid. Instead, plaintiff, with the SEC's approval, exchanged debentures which

according to their terms would not be redeemable in cash for thirty years. The preferred and preference shareholders' rights upon liquidation did not mature by reason of the operation of Section 11 of the Public Utility Holding Act.[3] Furthermore, it was not necessary for the provisions of the charter to be followed in a plan of simplification pursuant to Section 11 of the Public Utility Holding Company Act. In re Electric Bond & Share Co., 73 F.Supp. 426, 446 (S.D.N.Y.1946). The SEC had the power to authorize plaintiff, in its simplification of its financial structure pursuant to the SEC's order, to adopt a plan for retirement of the preferred and preference shares which would not amount to a redemption. In re Electric Bond & Share Co., *supra*. For instance, the SEC could even have authorized plaintiff to make a cash purchase of the outstanding shares in the open market at less than the redemption call price.[4]

In fact, the amended plan did not conform to the specific redemption provision of plaintiff's charter. As the SEC observed in its Findings and Opinion on the plan, retirement of securities pursuant to a plan of simplification under Section 11 of the Public Utility Holding Company Act is not voluntary. Furthermore the shareholders were not required at plaintiff's option to accept the plan, as would have been the case if their shares had been redeemed for cash pursuant to the charter. Since plaintiff offered debentures rather than cash, the stockholders exercised their right to oppose the plan and in fact the plan was consummated only after hard bargaining and a modification of the original offer resulted in their withdrawing their initial objections.

This view of the transaction was confirmed by the SEC which, in its Findings and Opinion on the amended plan of simplification, concluded that Cities Service's financial structure made it "extremely unlikely that Cities could presently undertake to redeem or refinance its preferred stock."[5] Furthermore the SEC stated plainly that the equivalence of call price and face amount of the debentures issued should not be interpreted to mean that a redemption had taken place:

"It is well established that in measuring the claims which preferred stockholders surrender in a Section 11(e) plan such as this, their rights in liquidation are not considered to have matured by operation of Section 11; and consideration must be given to all of the rights and limitations attaching to the preferred stocks, with primary emphasis upon immediately operative rights such as rights in respect of earnings and dividends as against inchoate rights such as rights in liquidation. [Citations omitted]" (Def's Ex. G. at 22).

Finally, in a footnote to its observation that if the new debentures should be called in the future the then holders would at that time receive an amount

---

3. In re New England Public Service Co., 73 F.Supp. 452, 456 (D.Me.1947); In re United Light & Power Co., 22 S. E.C. 704, 715–17 (1946).

4. SEC Reg. § 250.42 (CCH Fed.Sec.L. Rep., Vol. 3, ¶ 37,522), adopted in Release No. 35–6, Oct. 9, 1935, and amended in Release No. 35–6318, Dec. 27, 1945 (10 F.R. 15412), provides that

"No registered holding company or subsidiary thereof shall acquire, retire or redeem any security of which it is the issuer (or which it has assumed or guaranteed) except pursuant to a declaration notifying the Commission of the proposed transaction, which has become effective in accordance with the procedure specified in § 250.23 [¶ 36,655], and pursuant to the order of the Commission with respect to such declaration under the applicable provisions of the Act."

Certain exceptions and provisos follow, none of which are applicable to the transaction before us. The "procedure specified in § 250.23" is purely technical, and presents no obstacle to SEC approval of a cash deal with preferred shareholders.

5. Def's Ex. G at p. 24.

equal to the redemption call price of the shares, the Commission stated:

> "This result does not mean that we consider that the claims of the preferred and preference stockholders are being retired at their respective call prices, nor that they are entitled as a matter of law to the call price as such. It is well established that a retirement of senior securities pursuant to the impact of Section 11 is not a voluntary retirement so as to bring into play the redemption provisions of the charter or indenture. [Citations omitted]" (Def's Ex. G at 25 n. 35).

Nor did the SEC's determination that the plan was fair and equitable to all parties and that the debentures were the "equitable equivalent" of the rights surrendered imply that the debentures were worth their face value at the time of issuance. It merely meant that their discounted value was approximately equal to the value of the properties received in exchange. This was later recognized by the district court in discussing the argument that under the amended plan the redemption premium was being paid:

> "The argument that the premium is being paid must be based on the assumption that these 3% debentures are the equivalent of money. This is an assumption which I refuse to make. Even conceding that the debentures are superior in quality to the old preferred stock, it is still not certain they are of a grade to sell on a money basis and even if they were what the rate would have to be to support a price of 100." (In re Cities Service Company, 71 F.Supp. 1003, 1005 (D.Del.1947))

Thus the district court anticipated Judge (now Justice) Marshall's later observation in Nassau Lens Co. v. Commissioner of Internal Revenue, 308 F.2d 39 (2d Cir. 1962). that "surely a promise today to pay $150,000 in ten years is not presently worth $150,000 either in property or cash." (308 F.2d at 44).

Admittedly the decision to issue debentures in an aggregate face amount equal to the redemption call price of the preferred shares presented a superficial identity that lends support to defendant's position. The history of the parties' negotiations and of the proceedings before the SEC, however, confirm that the identity in face amounts represented nothing more than a plausible trading objective used by shareholders who objected to the original plan. Since holders of the existing 5% Convertible Debentures were under the plan to be paid the full call price of their bonds in cash, it was natural for the preferred shareholders to demand debentures equal to the call price of their shares. However, it was anticipated that the 3% debentures to be issued would probably be worth, in current market terms, significantly less than their face value. Apparently recognizing this the shareholders also sought an increased interest rate on the new debentures and more favorable terms in the indenture. See Def's Ex. E at 7–8, 12, 1144–45. The totality of these circumstances robs defendant's contention (that the exchange amounted to a redemption) of its force.

In further support of its contention defendant points to the fact that the plan as originally proposed contained a condition that 60% of the affected shareholders must approve the exchange before it could become effective, and that this condition was later deleted, thus making it possible to effectuate the change without shareholders' approval, just as a redemption could be carried out under the terms of the corporate charter. (Def's Main Brief at 6; Def's Ex. D Section "Fourth" Par. 7). The simple answer is that shareholder approval was not required for consummation of any exchange authorized by the SEC, including the exchange contemplated in the original plan. Furthermore, plaintiff's president in his testimony before the SEC Hearing Examiner explained that the original provision requiring shareholder approval was motivated by management's feeling that it had an obligation not to try to push the plan through without shareholder backing. (Def's Ex. E at 51). Removal of the provision was largely a response to

shareholders' objections to expenditures for solicitation of stockholders' assents. (See Def's Ex. E at 13, 1122–23, 1144).

■ In conclusion we view the 1947 issuance of debentures as an exchange and not a redemption.[6] It was a transaction whereby shareholders (whose dividends and preferential rights had long been "of little practical moment to them"[7]) became creditors owning long term debentures instead of stock. However one chooses to measure the consideration they gave up, there is every indication that it was substantially less than the face amount of the debentures they received.

### Is the Difference Deductible?

If plaintiff had in 1947 issued its debentures for cash amounting to less than the face amount of the debentures, it would, upon redeeming some of the debentures, have been entitled to deduct the excess paid out over the cash received as a loss under § 165(a) of the 1954 Code and treat the entire difference as an amortizable discount under Reg. § 1.61–12(c). Helvering v. Union Pacific R. R., 293 U.S. 282, 55 S.Ct. 165, 79 L.Ed. 363 (1934). Defendant further concedes that if plaintiff "had issued bonds at a discount and realized a net amount sufficient to purchase the securities in the market the difference between the face amount of the debentures and the realization would have been properly treated as discount" (Def's Memorandum at 31).

Similarly if plaintiff had issued the debentures in exchange for property worth less than the face amount of the debentures, it is settled in this Circuit that the difference could be treated in the same fashion. Nassau Lens Co. v. Commissioner of Internal Revenue, 308 F.2d 39 (2d Cir. 1962) (Marshall, C. J.); American Smelting & Refining Co. v.

United States, 130 F.2d 883 (3d Cir. 1942). The difference between the face amount of the bonds issued for property and the market value of the property acquired is treated as discount for the reason that it represents the cost of the money that would otherwise have to be borrowed in order to make a cash purchase of the property received in exchange. Nassau Lens Co. v. Commissioner of Internal Revenue, *supra.*

Defendant argues strenuously that in addition to establishing that the property acquired is worth less than the face amount of bonds issued for it, the taxpayer cannot treat the difference as a discount unless it also sustains the burden of proving that the difference is traceable to market demand for a higher effective interest rate than the stated yield of the bonds. While nothing in Reg. § 1.61–12(c) either requires or implies such a limitation, there is unquestionably judicial support for the proposition. See, e. g., San Joaquin Light & Power Corp. v. McLaughlin, 65 F.2d 677 (9th Cir. 1933); Dodge Brothers v. United States, 118 F.2d 95 (4th Cir. 1941); American Smelting & Refining Co. v. United States, 130 F.2d 883 (3d Cir. 1942); Montana Power Co. v. United States, 232 F.2d 541 (3d Cir. 1956) (dictum); Atchison, Topeka & Santa Fe Ry. v. United States, 69–2 U.S.T.C. ¶ 9740 (D.C.Kan.1969) (semble). There is also support for the contrary proposition. See, e. g., Baltimore Steam Packet Co. v. United States, 180 F.Supp. 347 (Ct.Cl.1960); Roberts & Porter, Inc. v. Commissioner of Internal Revenue, 307 F.2d 745 (7th Cir. 1962); Universal Tractor-Equipment Corp. v. United States, 67–1 U.S.T.C. ¶ 9409 (E.D. Va.1967); Missouri Pacific R. R. v. United States, 427 F.2d 727 (Ct.Cl. June 12, 1970). See also Fashion Park, Inc. v. Commissioner of Internal Reve-

---

6. Although the terms used in the amended plan would not be controlling, it is significant that the parties and the SEC described the issuance of debentures as an *"exchange,"* as distinguished from the retirement of the 5% Convertible De-

bentures, which was properly described as a "redemption," or call and cash payment in accordance with their terms. (Def's Ex. G p. 7).

7. Def's Ex. G at p. 23.

nue 21 T.C. 600 (1954) (where, however, the Commissioner apparently conceded the point at issue here, and the discussion concerns income rather than loss deductions).

■ Without attempting a detailed analysis of the above-cited decisions or suggesting that a crystallized rule can be distilled from them as to precisely when a difference in consideration may or may not be treated as a discount, we are convinced that the conflict between the decisions is more apparent than real. The general conclusion that we draw is that where a true loss has been sustained by the taxpayer's issuance of obligations payable at their face value at some future date, the debt-discount concept, which is at best a more or less arbitrary creation, will not be construed in a technical manner to bar the taxpayer from deducting the loss as discount. In short the difference between the face amount of a bond (which the issuer agrees to pay upon maturity) and the lesser consideration received upon its issuance "is normally considered" a discount in the absence of circumstances indicating that the difference was not intended as a discount. See Erie Lackawanna R. R. v. United States, 422 F.2d 425, 427–428 (Ct.Cl.1970).

In this case we face an additional problem in that the property acquired by plaintiff in exchange for issuance of its debentures consisted of plaintiff's own preferred shares and the hope of the holders of such shares that the plaintiff might at some future time pay them the amount of the accrued but undeclared and unpaid cumulative dividends.[8] This raises the question of whether such a reduction or change in a taxpayer's own capital structure may be treated as giving rise to loss or discount. Where obligations are issued for cash or other property in an amount less than face,

the existence of a loss or discount is readily ascertainable by reference to the fair market value of the property acquired. Where a taxpayer, however, acquires at a discount (in exchange for new bonds or debentures) obligations for which it received consideration equal to the full face amount upon original issuance, it is in effect issuing a new discounted obligation in place of an old one. No loss has been suffered by the taxpayer because at one time it has received the full face amount of the originally issued obligation. For this reason a deduction of the difference between the fair market value of the outstanding obligations and the face amount of the new ones has sometimes been denied. Missouri Pacific R. R. v. United States, 427 F.2d 727 (Ct.Cl. June 12, 1970); Erie Lackawanna R. R. v. United States, 422 F.2d 425 (Ct.Cl.1970). Such a transaction is treated as an "exchange of equals" in which "The corporation had not obligated itself to pay out any more than it had received." Missouri Pacific R. R. v. United States, *supra,* at 730 of 427 F.2d. Therefore the face value of the old obligations "at the time of their issuance is the true valuation of the securities *as far as plaintiff is concerned."* (*Id.* at 730; emphasis in original). Thus even though the fair market value of the taxpayer's own obligations may be less than the face amount of the new debentures being used to retire them, the difference will not be treated as a deductible loss or discount if the plaintiff originally received consideration equal to the face amount of the obligations being replaced.

Even assuming the applicability of the above principles to the present case, however, the record discloses the existence of deductible discount. The preferred and preference shares were originally issued in exchange for cash and

8. A cumulative dividend provision merely bars the management from paying dividends on common stock until the accumulated dividends are paid to the preferred. It does not, however, constitute the preferred stockholder a creditor or claimant for the accumulated undeclared dividends, unless the dividends have been withheld in bad faith. 11 W. Fletcher, Cyclopedia of Corporations ¶ 5325; 12 *id.* ¶ 5451 and cases there cited.

property amounting to $45,323,846. Even if there is added to this figure the sum of $49,671,950 for accrued undeclared cumulative dividends,[9] the resulting total of $94,995,796 is substantially below the face amount of the debentures issued, i. e., $115,246,950.

Defendant nevertheless argues that plaintiff should not be permitted to deduct any part of the difference between the face amount of the debentures, on the one hand, and any lesser value attributed to the preferred and preference shares received, on the other, for the reason that the result would be to allow non-deductible expenditures to be converted into deductible ones by the simple expedient of issuing debt obligations instead of paying cash. Under defendant's view, by issuing debentures plaintiff extinguished matured obligations in satisfaction of which it would otherwise have paid cash, in which case it could not have derived any deductions from the transaction. Plaintiff's position is that the debentures were merely a substitute for cash, and that the debentures-for-stock arrangement, as the equivalent of a cash version of the same transaction, should entail similar tax consequences.

The fallacy in defendant's approach, however, lies in its assumption that the 1947 transaction was a redemption in which plaintiff was using debentures instead of cash to redeem matured obligations that would total $115,246,950 if a cash redemption had been worked. As we have already pointed out, however, the exchange was not a redemption and the cash payment analogy therefore loses its force. Since the transaction amounted to a conversion of preferred stock and hopes for eventual payment of accrued accumulated dividends into creditors' claims, there is no reason to treat the issuance of debentures as a direct payoff of each of the elements of the call price that would be payable if there had been a redemption. In short if cash had been paid pursuant to the redemption provisions of the charter, there would not have been any deductible discount. But cash was not paid, and there was no redemption. Debentures were issued at a face value in excess of the consideration received for them, giving rise to deductible discount.

At the time when the preferred and preference shares were originally issued, Cities Service received certain cash and properties and assumed certain conditional obligations, i. e. (1) not to pay any dividends out of earnings or surplus to common stockholders as long as there were accrued but unpaid cumulative dividends on the preferred; (2) to pay stated value plus accrued and unpaid dividends to preferred shareholders upon any liquidation, dissolution or winding up, whether voluntary or involuntary, before any payment to the common stock; and (3) to pay the stated call price, including premium, plus unpaid dividends, to preferred stockholders upon any call for redemption. By 1947, 14 years of dividends on the preferred shares had been passed, precluding any dividends from being paid to the common until the accrued cumulative dividends were declared and paid. However, plaintiff was not obligated to purchase its own ownership (i. e., its preferred and preference shares) and its obligation to pay dividends to such holders was at most contingent on the existence of earnings and whether the management in good faith determined that the earnings should not be used for more essential corporate purposes. Certainly plaintiff had the absolute right not to redeem its preferred and preference shares.

■ The effect of the 1947 exchange was a radical change in plaintiff's debt obligations. In lieu of a conditional obligation to pay dividends on the preferred and preference shares, depending upon earnings and the management's good faith exercise of its discretionary powers, plaintiff now became firmly and

9. See note 8, *supra*.

unconditionally obligated to pay the face amount of the new debentures plus 3% interest annually on the unpaid balance. Even assuming *arguendo* a prior obligation to pay dividend arrearages, the maximum amount of the accrued dividends was $49,671,950, as against debentures in the face amount of $115,246,950. Viewed in this light, plaintiff indeed suffered a loss when in 1953 and 1954 it paid more to retire certain of the debentures than it had received for them. It is also clear that to allow plaintiff to deduct this loss is not to allow it to convert non-deductible expenditures into deductible expenditures by the simple expedient of paying in bonds rather than in cash. The "expedient" in question, if it can be so called, involved far more than the substitution of currencies urged by the defendant. It involved the assumption of enlarged and unconditional obligations by the plaintiff, as a result of which deductible losses have been realized.

### How is the Loss or Discount to be Determined?

Reduced to simplest terms the deductible loss or discount is the "difference between what is given up and what is received" by the taxpayer. Missouri Pacific R. R. v. United States, 427 F.2d at p. 733 (Ct.Cl.1970). In calculating that difference in the present case no disagreement exists as to the face amount of the new debentures or the amounts paid by plaintiff to repurchase some of them. It is equally clear that for present purposes the *minimum* amount which plaintiff may ascribe to the preference and preferred shares acquired by it is the original consideration received when the shares were issued, i. e., $45,323,846.[10] Furthermore, for the reasons we have already indicated, even if the market value of the shares at the time of the exchange had declined below their original issue price, plaintiff would be precluded from claiming the decline in val-

ue as a loss because, having received the cost price upon issuance of the shares, it had not actually suffered a loss to the extent of the market decline. Erie Lackawanna R. R. v. United States, 422 F.2d 425 (Ct.Cl.1970).

Thus the original cost of the preferred and preference shares represents a floor, or minimum value, for determining plaintiff's loss or discount. Relying principally upon the Court of Claims' recent decisions in *Erie Lackawanna* and *Missouri Pacific, supra,* plaintiff contends that the original issue or cost price of the shares should also represent the ceiling. With this we disagree.

■ Although a taxpayer, upon issuance of bonds in exchange for its shares, may not claim a loss based upon a decline in the market price of the shares below the price realized by it upon their original issuance, *Erie Lackawanna, supra; Missouri Pacific, supra,* it does not follow that the shares or obligations cannot turn out to have a greater value to the taxpayer than their original issue price. In the present case, for instance, even though the accrued and unpaid accumulated dividends did not constitute a firm obligation for which the plaintiff had received any consideration, the preferred and preference shareholders could use the dividend provisions of the charter to preclude plaintiff's management from paying any dividends on the common and to restrict the uses to which plaintiff's earnings could be put. Furthermore, it is possible that circumstances might arise where they could force the management to declare and pay part or all of the accrued dividends.[11]

■ Thus, where a taxpayer receives its own shares in exchange for issuance of its debentures, the value of "what is received" for purposes of determining the deductible loss or discount may be higher (though not lower) than the original issue price of the shares. The actual value to the taxpayer can be de-

---

10. It should be noted that the defendant has reserved the right to contest this figure. See page 74, *infra.*

11. See note 8, *supra.*

termined only after consideration of all relevant data, including the market value of the shares, the financial condition of the taxpayer at the time of the exchange, its profits prospects and expert opinion. Although the market price would be relevant, especially since it might reflect the public's opinion as to shareholders' prospects for participating in future corporate distributions, it would not be conclusive. Furthermore, market prices for the period immediately prior to the exchange might in the present case be discountable for the reason that from the date when the details of the amended plan became public investors may have assessed the shares in terms of the debentures for which they would soon be exchanged. The market price of the shares may also be vulnerable on the ground that it represented trading in a limited number of shares, whereas the exchange was concerned with the retirement of the entire issue of preferred and preference stock. Nevertheless we believe that after consideration of such relevant factors as may be offered, including market price, it should be possible to arrive at a figure representing the value to plaintiff of the shares in question. See, e. g., Atchison, Topeka & Santa Fe R. R. v. United States, 69–2 U.S.T.C. ¶ 9740 (D.Kan.1969).

### Affirmative Defenses

In its answer defendant contends that this court is without jurisdiction of certain of plaintiff's refund claims under 26 U.S.C. § 7422 [12] because of plaintiff's failure to file such claims with the Internal Revenue Service before instituting suit. More specifically, defendant urges that plaintiff has never filed (1) a loss-based claim for the taxable year

1953 under any measure of value; (2) a loss-based claim for the year 1954 on the original consideration measure; (3) a discount-based claim for either year for the unamortized portion of the discount attributable to debentures retired in those years; (4) a discount-based claim for either year under either the original consideration or adjusted market value measures of value. It is not contested that plaintiff did file discount-based refund claims for both years under a market *price* measure of value, or that the 1954 claim was later amended to add a loss-based claim employing the original consideration measure of value.

■ While refund claimants are not entitled to rely at the trial stage upon theories of law or versions of the facts which they did not assert in their original claims for refunds, Pelham Hall Co. v. Carney, 111 F.2d 944 (1st Cir. 1940); Nemours Corporation v. United States, 188 F.2d 745, 750 (3d Cir.), cert. denied, 342 U.S. 834, 72 S.Ct. 50, 96 L.Ed. 631 (1951); 10 Mertens, Law of Federal Income Taxation § 58.17, not every variation between the original claim and the complaint in a civil suit thereon is fatal to recovery. As this Circuit has stated:

> "We think that [the 1939 Code's equivalent of § 7422] go[es] no further than to require the taxpayer to set forth facts sufficient to enable the Commissioner of Internal Revenue to make an intelligent administrative review of the claim."

Scovill Manufacturing Co. v. Ftizpatrick, 215 F.2d 567, 569 (2d Cir. 1954). See also 10 Mertens, Law of Federal Income Taxation § 58.21.

12. Section 7422(a) provides as follows:
"*No Suit Prior to Filing Claim for Refund.*—No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary or his delegate, according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof."

■ We think that the instant case comes well within the immaterial variance category. Without reaching the question of whether plaintiff's original refund claims could be held sufficient to support every one of its theories and proposed measures of recovery in this suit, it is clear that its discount-based claims under a market price measure of the value of the preferred and preference shares received were more than adequate to apprise defendant of both the theory and measure of recovery on which we have proceeded in this opinion.

*Conclusion*

■ Although defendant has accepted plaintiff's calculations as to the original issue and adjusted market prices of the preferred and preference shares for purposes of our ruling on its motion for summary judgment, it has expressly reserved the right, in opposing plaintiff's similar motion, to challenge these figures and to exercise its rights under Rule 56(f), F.R.Civ.P., to cross-examine or depose the experts upon whom plaintiff relies. Upon plaintiff's motion for summary judgment an issue of fact is therefore raised as to the amount of the dollar value to plaintiff of the preferred and preference shares surrendered in exchange for defendant's issuance of its debentures in 1947.

Plaintiff's motion for summary judgment is therefore denied. Pursuant to Rules 56(c), (d), however, we conclude that the sole material fact actually controverted is the value to plaintiff of the preferred and preference shares received by it upon issuance of its debentures and that no genuine issue is presented as to all other material facts, which shall be deemed established. Accordingly a trial will be conducted as to the remaining issue, and once the value of the shares received has thus been determined, any refunds due plaintiff will be determined by simple mathematical computation.

Defendant's motion is denied in all respects.

Settle order on notice.