CITIES SERVICE COMPANY,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 67 Civ. 4606.

United States District Court,
S. D. New York.

June 11, 1973.

Robert J. Casey, Thomas E. Tyre, Casey, Tyre, Wallace & Bannerman, New York City, for plaintiff; Ronald W. Blasi, James W. Robinson, Frueauff, Farrell, Sullivan & Bryan, New York City, of counsel.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., New York City, for defendant; Daniel H. Murphy, II, Samuel J. Wilson, New York City, of counsel.

OPINION

TENNEY, District Judge.

This is an action pursuant to 26 U.S. C. § 7422 (1970) and 28 U.S.C. § 1346(a)(1) (1970) for refund of income taxes paid by plaintiff for the calendar years 1953 and 1954. Plaintiff, in 1947, issued 30-year 3 percent debentures with a face value of $115,246,950 in exchange for shares of its own $6 preferred stock, $6 preference BB stock, and 60¢ preference B stock.[1] By the terms of the in-

---

1. The preferred stock $6 cumulative was preferred as to dividends over the two classes of preference stocks and the common stock, and the preference BB and

denture, plaintiff was required to retire annually $1,500,000 principal amount of debentures. In 1953 and 1954 plaintiff purchased in the open market and retired in excess of $1,500,000 principal amount of debentures. Plaintiff asserts that when the debentures were issued in 1947 it received less in value for them than their face value, and alleges that the difference between the face amount of the debentures and the consideration received by it on the exchange is a "loss" within the meaning of 26 U.S.C. § 165(a) (1970), which loss may be realized as the debentures are redeemed or amortized over the life of the debentures. Treas.Reg. § 1.61–12(c)(3) (1968).

This case is before the Court pursuant to an order entered on February 11, 1971, by United States District Judge (now Circuit Judge) Walter R. Mansfield. The order was entered pursuant to an opinion dated July 23, 1970, in which Judge Mansfield denied motions for summary judgment made by plaintiff and defendant. Cities Service Co. v. United States, 316 F.Supp. 61 (S.D.N.Y.1970). The order decreed:

". . . that this case be set down for trial in due course with the sole factual question to be resolved thereat being the value to plaintiff of the preferred and preference shares received by it in exchange for the issuance of its 3% Thirty Year Sinking Fund Debentures ("the Bonds") on May 27, 1947; and

". . . that . . . the bonds shall be deemed issued at a price equal to the value to plaintiff of the preferred and preference stocks received

in exchange for their issuance on May 27, 1947; and

". . . that . . . the value of those shares to plaintiff shall be no less than $45,323,846, the value of the consideration originally received for their issuance . . . ."

On February 9, 1971, defendant's second motion for summary judgment was heard by United States District Judge Inzer B. Wyatt and denied on June 21, 1971, in an opinion reaffirming Judge Mansfield's determination. Cities Service Co. v. United States, 330 F.Supp. 421 (S.D.N.Y.1971).

Although both Judge Mansfield's and Judge Wyatt's opinions, findings of fact and conclusions of law are incorporated herein, it will be helpful to repeat certain of the conclusions reached by Judge Mansfield in order to define the specific issue remaining.

From the evidence before him, Judge Mansfield concluded, first, "that the shares were worth less than the face amount of the debentures", and, second, "that the 1947 exchange did not constitute a redemption". 316 F.Supp. at 66. "In conclusion we view the 1947 issuance of debentures as an exchange and not a redemption. . . . However one chooses to measure the consideration they gave up, there is every indication that it was substantially less than the face amount of the debentures they received." Id. at 69. On the motion for summary judgment, plaintiff, relying principally on the Court of Claims' decisions in Erie Lackawanna R.R. v. United States, 422 F.2d 425, 190 Ct.Cl. 682 (1970) and Missouri Pacific R.R. v. United States, 427 F.2d 727, 192 Ct.Cl. 318 (1970), cert. denied, 402 U.S. 944,

preference B stocks ranking *pari passu*, were preferred as to dividends over the common stock.
On liquidation or dissolution, whether voluntary or involuntary, the preferred stock was entitled to $100 per share plus unpaid accrued dividends before any distribution was made to other stockholders and the BB and B preference stocks were entitled to $100 per share and $10 per

share, respectively, plus unpaid accrued dividends, before any distribution could be made to the common stock.
The preferred, the BB preference and the B preference stock were subject to redemption, in whole or in part, at any time, by the payment of an amount equal to $112, $106 and $10.60 per share, respectively, plus unpaid accumulated dividends.

91 S.Ct. 1618, 29 L.Ed.2d 112 (1971), argued not only that the original cost of the preferred and preference shares represented the minimum value for determining its loss or discount, but also that this figure represented the maximum. Judge Mansfield disagreed with the latter proposition holding:

"Although a taxpayer, upon issuance of bonds in exchange for its shares, may not claim a loss based upon a decline in the market price of the shares below the price realized by it upon their original issuance, [citing *Erie Lackawanna* and *Missouri Pacific, supra*] it does not follow that the shares or obligations cannot turn out to have a greater value to the taxpayer than their original issue price". 316 F.Supp. at 72.

It is interesting to note that on the basis of Judge Mansfield's opinion the Court of Claims modified its prior opinion in *Missouri Pacific, supra,* and held that the original issue or cost price did not represent the ceiling value for the purpose of calculating debt discount. Missouri Pacific R.R. v. United States, 433 F.2d 1324, 193 Ct.Cl. 257 (1970), cert. denied, 402 U.S. 944, 91 S.Ct. 1618, 29 L.Ed.2d 112 (1971). Judge Mansfield further observed that

"even though the accrued and unpaid accumulated dividends did not constitute a firm obligation for which the plaintiff had received any consideration, the preferred and preference shareholders could use the dividend provisions of the charter to preclude plaintiff's management from paying any dividends on the common and to restrict the uses to which plaintiff's earnings could be put." 316 F.Supp. at 72.

He concluded that "[t]he actual value to the taxpayer can be determined only after consideration of all relevant data, including the market value of the shares, the financial condition of the taxpayer at the time of the exchange, its profits prospects and expert opinion." *Id.* at 72–73.

In accordance with Judge Mansfield's opinion and the order entered pursuant thereto, plaintiff called three experts in the fields of corporate finance, value analysis, economics and business management and has submitted other evidence. These experts appraised the exchange from three different viewpoints:

1) The general economic aspects of the exchange, an analysis of the specific economic and financial benefits and burdens resulting to plaintiff therefrom and the net effect of the exchange in light of the prevailing economic conditions on May 27, 1947;

2) An economic and financial analysis of plaintiff and the securities involved to ascertain what value, if any, apart from the amount or value received when the preferred and preference shares were issued, accrued to plaintiff on account of the exchange; and

3) An analysis of the effect of the issuance of the debentures on plaintiff's financial and economic structure.

*General economic aspects and specific benefits and burdens resulting to plaintiff from exchange.*

According to plaintiff's expert, Dr. Jules Backman, there were, of course, benefits which accrued to plaintiff upon the exchange: it enabled plaintiff to conform to and comply with the Public Utility Holding Company Act; it got plaintiff the benefit of a tax deduction for interest payments; and the elimination of the preferred and preference stocks permitted plaintiff to pay dividends to the common stockholders if money were available for that purpose. It seems clear, however, that the net effect of the exchange was adverse to plaintiff. Plaintiff exchanged its senior stocks (*i. e.,* the preferred and preference stock) on which, except for one small payment, it had not paid a dividend since 1932 and on which, under normal circumstances, it would not be required to pay dividends for the fore-

seeable future, for debentures, fixed and determinable debt obligations with mandatory annual interest payments and mandatory sinking fund requirements. So although plaintiff became entitled to a tax deduction for the interest payments on the debentures, it was henceforth required to pay such interest in addition to having to establish a sinking fund to redeem the debentures. Whereas with the preferred and preference shares outstanding, plaintiff had had the continuing option to avoid paying out cash to its equity holders and to use the funds to pay off debts or to expand its plant and equipment, the exchange resulted in a constant cash drain on the company of more than $3,600,000 annually. Moreover, the issuance of the debentures gave plaintiff an exceedingly high proportion of debt to equity capital, and the indenture of the new debt burdened plaintiff with additional restrictions on its future debt financing based upon an earnings level ratio.

*Economic and financial analysis of plaintiff and the securities involved.*

In his opinion Judge Mansfield noted that "the face amount of the debentures issued in 1947—$115,246,950—was identical with the cash amount that plaintiff would have been required to pay to the preference and preferred shareholders if it had chosen to redeem their shares." *Id.* at 66. Plaintiff's expert, William R. Field, broke down the principal amount in slightly greater detail as follows:

| | |
|---|---|
| 1) Original discount on preferred and preference stock when issued | $ 13,366,154 |
| 2) Stated call premium | 6,885,000 |
| 3) Accumulated dividend arrearages | 49,671,950 |
| 4) Original consideration for the issuance of the preferred and preference stock | 45,323,846 |
| | $115,246,950 |

In accordance with Judge Mansfield's decision, the original consideration, *i. e.,* $45,323,846, is the "floor" with respect to the issue before this Court. Accordingly, at trial plaintiff's expert directed himself to the question of whether plaintiff could have realized or acquired value on account of the excess between the "floor" and a "ceiling" represented by the $115,246,950 of debentures. Insofar as the stated call premium of $6,885,000 was concerned, he was of the opinion that it was a "penalty" payable on redemption and not value received by plaintiff. Even if plaintiff had *liquidated,* the stockholders would not have received a call premium. Since it already has been held that there was no redemption, this premium would appear to have been a windfall for the stockholders.

The dividend arrearages of $49,671-950 present a more serious problem. It is not disputed that accumulated, undeclared dividends on preferred or preference stock do not constitute a binding legal obligation of plaintiff, unless the dividends were withheld in bad faith. *Id.* at 70 n. 8. Upon analysis of investor behavior, plaintiff's financial condition and the charter provisions relating to the preferred and preference stock, plaintiff's expert concluded that nothing of value was received by plaintiff on account of the accumulated, undeclared dividends. His conclusion that no value accrued on account of the arrearages was predicated upon the following factors:

1) Analysis of the market prices showed that investors were not anticipating the payment of arrearages. In the opinion of the expert, a comparison of the market activity and prices of the stock when dividends *were* being paid and arrearages *had not* accumulated, with such activity and prices when there were *no* dividends paid and arrearages *had* accumulated, indicated that investors in plaintiff's preferred and preference stocks were *not* anticipating the payment of arrearages. The foregoing conclusion was corroborated by the expert's analysis of the price-yield ratios or relative yield factors of the preferred and preference stocks and the general yield percentages of other high grade preferred stocks using the stated dividend rate whether or not paid.

2) Analysis of plaintiff's financial structure indicated that it was not possible for it to pay the arrearages. Such analysis was predicated *inter alia* upon a study of plaintiff's annual earnings record, net income, accumulated arrearages, net income as a percentage of arrearages, net income available for dividend arrearages, after-tax interest coverage, and a comparison of plaintiff's financial situation with that of three independent yardstick groups of companies (*i. e.*, thirty petroleum companies, all natural gas companies reporting to the Federal Power Commission, and all Class A and B electric companies similarly reporting) to determine whether plaintiff was in such comparatively good financial condition that it could, should, or would pay the accumulated dividend arrearages. The yardstick companies were compared with plaintiff as to interest coverage, rates of return on equity capital and on total capital, relative percentages of net income plus interest as percentages of total income, interest as a percentage of average debt capital, long term debt capital as a percentage of total capital, and common and preferred capital as a percentage of total capital. The yardstick companies interest coverage for the period 1940–1946 greatly exceeded that of plaintiff, indicating a need for plaintiff to reduce debt charges and consequently to increase its coverage. Comparison of plaintiff with the yardstick companies as to rate of return earned on average common and preferred capital and rate of return earned on average total capital showed that plaintiff's earnings were substandard. Net income as a percentage of total income (net income plus interest), interest as a percentage of net income plus interest, and interest as a percentage of average debt capital when compared as between plaintiff and the yardstick companies indicated that plaintiff's relative net income was extremely low or, conversely, that its debt structure and interest charges were very high when compared to other competitive companies. Likewise, the paralleling of capital structure ratios and the percentages of total capital represented by debt and equity evidenced the high debt or low equity level of plaintiff compared to the criteria groups. Plaintiff's capital structure proved to be several times heavier with debt than that of the yardstick petroleum companies and significantly heavier than the yardstick gas and electric companies, while its equity as a percentage of total capital was much lower than that of the yardstick companies. On the basis of the foregoing, plaintiff's expert concluded: (a) that plaintiff was not in a position either to pay the dividend arrearages or to issue debt obligations for them; (b) that the retirement and cancellation of the stock did not release to, or provide plaintiff with, any additional funds for the payment of its obligations or for dividends to common stockholders; (c) that since the stock "disappeared" upon the exchange, no "investment value" accrued; and (d) that cancellation of the stock converted into a firm, binding debt obligation which must be paid at all events, a contingent claim relating only to relative priorities among shareholders in any distribution of earnings which, if left to its own devices plaintiff most likely would have disposed of at little cost to itself.

*Effect of the issuance of the debentures on plaintiff's financial and economic structure.*

Finally, plaintiff presented through the expert testimony of William A. Gill an analysis of the effect of the issuance of the debentures on its financial and economic structure. It was the expert's opinion that as a result of the exchange plaintiff's financial condition had deteriorated.

It should be noted that at the trial none of plaintiff's three experts offered an opinion as to the "fair market value" of the preferred and preference stock as of May 27, 1947, but only as to the "value to plaintiff" of such stock. As will appear *infra*, however, such opinion evidence of "fair market value", not specif-

ically rebutted by any of the parties, does form a part of the trial record herein.

Defendant relied upon the testimony of three expert witnesses, as did plaintiff. Although the issue before the Court was the value *to plaintiff* of the preferred and preference shares, none of defendant's witnesses directed himself to that issue but spoke of "investment values" to the stockholders, or benefit to the common stockholders. Two of defendant's experts went so far as to testify that the value to the taxpayer (by way of value to the common stockholders) was in excess of the face amount of the debentures, while the third expert testified that plaintiff would in his opinion clear up the accumulated arrearages within ten years, and accordingly, that the value of the preferred and preference stock to plaintiff was $115,246,950—*i. e.*, the face value of the debentures.

The Court rejects the opinions of defendant's experts in their entirety. Their opinions cannot withstand analysis, are based upon false premises, or fail to reach the issue herein—as has clearly been demonstrated by plaintiff in its "Requested Findings of Fact and Conclusions of Law and Brief in Support Thereof" at 37–59 and "Reply Brief" at 12–17.

Despite the failure of the experts for either party to fix during the trial the fair market value of the stock on May 27, 1947, there is, as has been indicated, expert evidence on record fixing such value. In its papers on the motion for summary judgment before Judge Mansfield *plaintiff asserted that the fair market value of the preferred and preference stock at the time of the exchange was $86,313,600.* (Def.'s Exh. B, "Rule 9(g) Statement" ¶ 51.) More specifically plaintiff put forward the following valuations as of May 27, 1947:

| Class of Stock | No. of Shares | Fair Market Value Per Share | Aggregate Fair Market Value |
|---|---|---|---|
| $6 Preferred | 560,000 | $147.50 | $82,688,500.00 |
| 60¢ Preference B | 86,000 | $13.75 | 1,182,500.00 |
| $6 Preference BB | 17,700 | $138.00 | 2,442,600.00 |
| | | Total | $86,313,600.00 |

The basis for the above valuation was an affidavit of William A. Gill dated January 27, 1970, and supporting data. (Def.'s Exh. B, "Rule 9(g) Statement" Exh. 1.) Other than a passing reference, no mention of this valuation was made by either party in its briefs before this Court, although the Court specifically called it to the attention of counsel in the course of the trial (Tr. 241–42). Moreover, pursuant to Judge Mansfield's opinion, defendant had "the right . . . to challenge these figures and to exercise its rights under Rule 56(f), F.R.Civ.P., to cross-examine or depose the experts upon whom plaintiff relies." 316 F.Supp. at 74. Gill's expert opinion remains unrebutted, plaintiff now adher-

ing to its claim that the "floor" of $45,323,846 is determinative, whereas defendant maintains that the "ceiling" of $115,246,950 or some greater figure should control. In this respect plaintiff apparently has abandoned the first of two theories in support of its claim. As stated by Judge Mansfield:

"Plaintiff advances two theories in support of its claim to a tax deduction arising from its repurchase of debentures in 1953 and 1954. Both theories are based on plaintiff's contention that it paid more to redeem the debentures than it received in exchange for them upon issuance in 1947. What it received—the issue price of the debentures—plaintiff contends, was either

the fair market value of the preferred and preference shares surrendered upon the 1947 exchange ($86,313,600.00), *or* the fair market value of the cash and properties originally paid in upon issuance of those shares in prior years ($45,323,846.00). The first theory holds simply that a deductible loss was realized upon repurchase of debentures at a price higher than the price realized upon their issuance. The second theory, based on Reg. § 1.61–12, holds that the issuance of the debentures at less than face in 1947 gave rise to bond 'discount' within the meaning of that Regulation, entitling plaintiff to prorate or amortize the discount over the life of the bonds and to deduct both the amortization thereof for the taxable years in question and the unamortized portion of the discount attributable to the debentures retired in those years. Each theory produces two figures for the proposed deduction, depending on which of the two measures of the issue price of the debentures in 1947 is employed. See Complaint ¶¶ 35–39, 44–48." *Id.* at 65.

While the correct basis for determining loss or discount in situations of this kind is not entirely clear, and there is authority for each of the two theories postulated by plaintiff, such basis would appear to be the difference between the issue price originally received by the taxpayer (plaintiff) for the preferred and preference stock *or* the fair value of such stock to the taxpayer at the time of the exchange, whichever is higher, and the face value of the debentures. *See* Gulf, Mobile & Ohio R.R. v. United States, 339 F.Supp. 489 (S.D.Ala.1972) (containing a discussion of the pertinent cases in chronological order). While there is authority for the proposition that value at time of exchange is irrelevant when a corporation is retiring its own stock rather than acquiring the stock of some other entity or retaining its own reacquired stock—Erie Lackawanna R.R. v. United States, *supra,* 422

F.2d 425—later authority is to the contrary. Missouri . Pacific R.R. v. United States, *supra,* 433 F.2d 1324. Indeed, in National Alfalfa Dehydrating & Milling Co. v. Commissioner, 472 F.2d 796 (10th Cir. 1973) the court found, with one dissent, that an allowable discount occurred when the taxpayer issued $50 debentures in exchange for $50 par value preferred stock when at the time of the exchange the fair market value of the preferred stock was only $33 per share, even though the taxpayer originally had received $50 per share on issuance of the preferred. While this holding runs counter in one respect to what this Court has suggested is the correct basis for determining loss or discount, it is not relevant to the instant case since the value herein in any event cannot be less than what plaintiff originally received.

Returning to the appraisal of William A. Gill dated January 27, 1970, referred to hereinbefore, among the facts and circumstances which he considered were

"a) The economy of the United States during the period 1930 through 1947, inclusive. . . .

"b) The history of the public utility industry with particular emphasis on its experience under the Public Utility Holding Company Act of 1935. . . .

"c) The history of 'Cities Service Company with particular emphasis on: the history and nature of its business; its experience under the Public Utility Holding Company Act of 1935; its operating results over the period 1935 through 1946, inclusive; its capital structure from inception through May 27, 1947; and the trading activity in its various securities over the 1935–1947 period. . . ." (Def.'s Exh. B, "Rule 9(g) Statement" Exh. 1, Gill Affid. ¶ 15.)

After consideration of these and other factors he concluded:

"(a) In general, the financial condition of Cities Service improved

significantly over the period January, 1935 to October 31, 1946. Nonetheless, at all times pertinent to the period of investigation, analysis, and study, the preferred and preference shares of Cities Service, where speculative in nature. While the market prices on the New York Stock Exchange for these preferred and preference shares were supported by active trading during the period January, 1943 through May, 1947. [*sic*] However, from November 20, 1946 these prices were dependent on the value of the consideration to be received in exchange for such shares; i. e. the 3% Sinking Fund Debentures in the aggregate principal amount of $115,246,950.

"(b) That a valuation of the Cities Service preferred and preference shares as of May 27, 1947 predicated on the plan of simplification as amended fails to reflect the true inherent worth of such shares in light of the fact that from November 20, 1946 to May 27, 1947, the value of these shares was totally dependent upon the value of the announced consideration to be received in exchange therefor; i. e. the new Cities Service Debentures.

"(c) In order to determine the fair market value of the Cities Service preferred and preference shares on their own merits as a security as of May 27, 1947, it is necessary to analyze such shares at that point in time prior to any proposed plan of simplification.

"(d) That in his opinion as of May 27, 1947, the fair market value of the Cities Service preferred and preference shares, on their own merits as a security, without reference to any announced plan of simplification, was as set forth below:

| Security | Fair Market Value |
| --- | --- |
| $6.00 Preferred | $147.50 per share |
| $6.00 Preference BB | 138.00 per share |
| $0.60 Preference B | 13.75 per share" |

(*Id.* at ¶ 20.)

Plaintiff contended, on the motion for summary judgment, and defendant provisionally conceded for the purpose of that motion, "that at the time of the exchange in 1947 the aggregate fair market value of the preferred and preference shares was $86,313,600.00" based on the Gill appraisal. 316 F.Supp. at 65. Does such "fair market value" constitute the "value to plaintiff which is the issue before this Court? It seems clear that Gill's appraisal was based on "consideration of all relevant data, including the market value of the shares, the financial condition of the taxpayer at the time of the exchange, its profits prospects and expert opinion." *Id.* at 73. Furthermore, although, as Judge Mansfield emphasized, market *price*, while relevant, would not be conclusive (*Id.*), the average market price for the stocks concerned on November 20, 1946, based on the average of the high and low for the week preceding and following that date, was:

| $6.00 Preferred | $149.375 |
| --- | --- |
| $6.00 Preference BB | $145.375 |
| 60¢ Preference B | $ 14.6875 |

Obviously, after November 20, 1946, when the original plan was proposed, the market price was dependent on the value of the consideration to be received in exchange for the stock, and nowise constituted a measure of the "value to plaintiff" of the stock, and Gill recognized this in making his appraisal. Furthermore, the average market price for the stock in 1946 was:

| $6.00 Preferred | $145.50 |
| --- | --- |
| $6.00 Preference BB | $136.00 |
| 60¢ Preference B | $ 13.375 |

Thus it appears that, while the average market price for the period immediately preceding and following the submission of the plan of November 20, 1946, exceeded Gill's determination of a

fair market value, the average market price during 1946 was less than that fair market value with respect to each class of stock. Furthermore, the market must have been aware of the situation involving plaintiff well before this time.

The issue resolves itself, accordingly, to the alternative valuations referred to by Judge Mansfield: the fair market value of the stock surrendered upon the 1947 exchange ($86,313,600.00) *or* the fair market value of the cash and properties originally paid in on the issuance of the stock ($45,323,846.00).[2] The basic determination is a legal one and, on the basis of the authorities cited herein, requires the rejection of the second alternative.

Accordingly, the Court finds that the value to plaintiff of the preferred and preference shares received by it in exchange for the issue of its 3 percent Thirty Year Sinking Fund Debentures on May 27, 1947, was $86,313,600.00, said valuation being computed as follows:

| Class of Stock | No. of Shares | Value Per Share | Total Fair Value |
|---|---|---|---|
| $6.00 Preferred | 560,000 | $147.50 | $82,688,500.00 |
| $6.00 Preference BB | 17,700 | $138.00 | 2,442,600.00 |
| 60¢ Preference B | 86,000 | $13.75 | 1,182,500.00 |
| | | Total | $86,313,600.00 |

Submit final judgment in conformity herewith and with the prior orders entered herein on twenty (20) days' notice.

2. The $45,323,846.00 figure was subject to defendant's right to contest its accuracy. 316 F.Supp. at 72 n. 10. Although defendant elicited from plaintiff's expert Field an admission that he had accepted Judge Mansfield's figures without independent investigation, this would scarcely constitute a satisfactory exercise of its right to contest accuracy. However, in view of the determination reached herein, whether the $45,323,846.00 figure or the stated value of $58,690,000.00 is the correct "floor" is irrelevant.