CITIES SERVICE COMPANY,
Plaintiff-Appellee-Appellant,

v.

UNITED STATES of America,
Defendant-Appellant-Appellee.

Nos. 162, 387, Docket 74–1221, 74–1490.

United States Court of Appeals,
Second Circuit.

Argued Oct. 7, 1974.

Decided Dec. 13, 1974.

Certiorari Denied Oct. 6, 1975.

See 96 S.Ct. 43.

Daniel H. Murphy, II, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty., John W. Nields, Jr., Mel P. Barkan and Samuel J. Wilson, Asst. U. S. Attys., on the brief), for defendant-appellant-appellee.

Thomas E. Tyre, New York City James W. Robinson, Casey Craig & Constance, and Frueauff, Farrell, Sullivan & Bryan, New York City, on the brief), for plaintiff-appellee-appellant.

Before KAUFMAN, Chief Judge, and SMITH and TIMBERS, Circuit Judges.

TIMBERS, *Circuit Judge:*

On these cross-appeals from a judgment entered November 20, 1973 in a tax refund action after a bench trial in the Southern District of New York, Charles H. Tenney, District Judge, 362 F.Supp. 830,[1] awarding the taxpayer, Cities Service Company (Cities), recovery of federal corporate income taxes and interest for the calendar years 1953 and 1954 in the amount of $1,371,397.91 claimed to have been erroneously assessed and collected, the essential questions are:

(1) Whether the district court correctly determined that Cities' exchange of its debentures for its outstanding preferred stock resulted in a deductible debt discount.[2]

---

1. Judge Tenney's opinion incorporated the findings of fact and conclusions of law set forth in two prior district court opinions in this refund action: one filed July 23, 1970 by Walter R. Mansfield, then District Judge, 316 F.Supp. 61, and the other filed June 21, 1971 by Inzer B. Wyatt, District Judge, 330 F.Supp. 421.

2. Cities claimed a deduction alternatively under Section 163(a) of the 1954 Code (for interest paid) or under Section 165(a) of the 1954 Code (for a loss sustained). We set forth both provisions here. Since, however, the Supreme Court in Commissioner v. National

Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 147 (1974), established that the two theories are merely alternative descriptions of the same economic reality, we believe that they cannot lead to different tax consequences. Accordingly, we find it necessary to discuss only the discount theory.

Internal Revenue Code of 1954, § 163(a), 26 U.S.C. § 163(a) (1970) [formerly Int.Rev. Code of 1939, § 23(b), 26 U.S.C. § 23(b) (1952)], provides:

"§ 163. Interest

(a) General rule.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness."

(2) Whether the district court correctly determined the appropriate measure of that debt discount.

(3) Whether the district court correctly determined, in computing the deduction to be allowed to Cities for the years 1953 and 1954, that there should be excluded any amortization of debt discount attributable to the pre-1953 years since Cities did not claim such a deduction in its pre-1953 returns.

For the reasons below, we affirm the district court's determinations that the transaction did result in a debt discount which is allowable as a deduction and that there should be excluded any amortization of debt discount attributable to the pre-1953 years; but we reverse and remand for a redetermination of the appropriate measure of the debt discount to be deducted.

## I. PRIOR PROCEEDINGS AND CLAIMS OF THE PARTIES

In view of the full exposition of these matters in the opinions of the district court referred to above, it is sufficient for our purpose briefly to summarize only those prior proceedings, claims of the parties and facts necessary to an understanding of our rulings below.

In 1941, Cities Service Company, a Delaware corporation, became a registered holding company under the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79 et seq. (1970). Pursuant to Section 11(e) of the Holding Company Act, 15 U.S.C. § 79k(e),[3] Cities was required to simplify its corporate and capital structures. It submitted a plan which in due course was approved by the SEC as amended after hearings as to its fairness. The plan ultimately was enforced by the court. In re Cities Service Co., 71 F.Supp. 1003 (D.Del.1947).

The amended plan provided for prompt cash redemption of certain outstanding debentures and the issuance of new 30-year 3% sinking fund debentures in exchange for all of Cities' outstanding preferred and preference stock (three classes).[4] The aggregate face amount of the new debentures ($115,246,950) was equal to the stated value[5] of the preferred and preference stock ($58,690,000), plus the call premiums ($6,885,000), plus dividend arrearages accumulated over 14

Internal Revenue Code of 1954, § 165(a), 26 U.S.C. § 165(a) (1970) [formerly Int.Rev. Code of 1939, § 23(f), 26 U.S.C. § 23(f) (1952)], provides:

"§ 165. Losses

(a) General rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise."

3. The so-called "death sentence" provision.

4. When the plan became effective on May 27, 1947, pursuant to the order of the Delaware District Court, In re Cities Service Co., *supra*, Cities had outstanding three separate classes of preferred and preference stock: (1) preferred stock; (2) preference B stock; and (3) preference BB stock.

The preferred class consisted of 560,600 shares of $6.00 cumulative preferred stock carrying an annual dividend of $6.00 and callable at Cities' option at $112 per share ($100 stated value, plus $12 call premium), together with accumulated and unpaid dividends. As of May 27, 1947, each share of preferred was carrying $84.50 in dividend arrearages. The redemption price for each share of preferred was $196.50. The total redemption price for the 560,600 shares outstanding was $110,157,900.

The preference B class consisted of 86,000 shares of 60 cents cumulative no par stock carrying an annual dividend of 60 cents and callable at Cities' option at $10.60 per share ($10 stated value, plus 60 cents call premium), together with accumulated and unpaid dividends. As of May 27, 1947, each share of preference B stock was carrying $8.75 in dividend arrearages. The redemption price for each share of preference B was $19.35. The total redemption price for the 86,000 shares outstanding was $1,664,100.

The preference BB class consisted of 17,700 shares of $6 cumulative no par stock carrying an annual dividend of $6 and callable at Cities' option at $106 per share ($100 stated value, plus $6 call premium), together with accumulated and unpaid dividends. As of May 27, 1947, each share of preference BB stock was carrying $87.50 in dividend arrearages. The redemption price for each share of preference BB was $193.50. The total redemption price for the 17,700 shares outstanding was $3,424,950.

See 316 F.Supp. at 64–65 (Mansfield, J.).

5. The three classes of preferred and preference stock originally were issued by Cities at various times for cash and properties having

years ($49,671,950). Each share of each class of the preferred and preference stock was to receive precisely its call price in face amount of new debentures in the exchange.

By the terms of the indenture under which the debentures were issued, Cities was to retire at least $1,500,000 in principal amount of the debentures annually through a sinking fund. Accordingly, during 1953 it purchased $1,519,500 in face amount of the debentures at a cost of $1,398,357.39; and during 1954 it purchased $1,805,900 in face amount of the debentures at a cost of $1,786,569.02.

Cities paid its taxes for the years 1953 and 1954. It then filed a claim for refund with the District Director, asserting the position summarized below. When no action had been taken with respect to its claim for 1953 after six months and when its claim for 1954 had been disallowed,[6] Cities commenced the instant refund action.[7]

Cities' essential claim is that it received less in value for the debentures than their face amount when they were issued on May 28, 1947 in exchange for its outstanding preferred and preference stock. In short, it says that it issued the debentures at a discount. More specifically, it contends that it received either $45,323,846, the fair market value of the cash and properties originally paid in upon issuance of the preferred stock, or $86,313,600,[8] the fair market value of the preferred stock surrendered in the 1947 exchange.

Starting with this premise that the debentures were issued at a discount, Cities urged two alternative theories in the district court in support of its claim for a refund. They were summarized by the district court as follows:

"The first theory holds simply that a deductible loss was realized upon re-

purchase of debentures at a price higher than the price realized upon their issuance [Int.Rev.Code of 1954, § 165(a)]. The second theory, based on Reg. § 1.61–12 [now Treas.Reg. § 1.163–3(c)(1) (1968)], holds that issuance of the debentures at less than face in 1947 gave rise to bond 'discount' within the meaning of that Regulation, entitling plaintiff to prorate or amortize the discount over the life of the bonds and to deduct both the amortization thereof for the taxable years in question and the unamortized portion of the discount attributable to the debentures retired in those years. Each theory produces two figures for the proposed deduction, depending on which of the two measures of the issue price of the debentures in 1947 is employed [$45,323,846 or $86,-313,600] . . . ." 316 F.Supp. at 65 (Mansfield, J.).

The district court summarized the government's position with respect to both theories as follows:

"Defendant's answer to both theories is the same: the debentures were issued at face value. Hence no discount arose from the exchange, and since the consideration received for the debentures equalled their face value, no loss was sustained when plaintiff repurchased them at less than face in 1953 and 1954. Defendant also contends that even if the debentures were issued at less than face, the differential is not deductible discount." *Id.* at 65.

The positions of the parties as summarized above have continued to remain substantially the same.

On the first round in the district court—on cross-motions for summary judgment—Judge Mansfield rejected the

an aggregate fair market value of $45,323,846 (the original consideration).

**6.** Int.Rev.Code of 1954, § 6532(a), 26 U.S.C. § 6532(a) (1970).

**7.** Pursuant to Int.Rev.Code of 1954, § 7422, 26 U.S.C. § 7422 (1970), and 28 U.S.C. § 1346(a) (1970).

**8.** Although Cities alleged in its complaint that this value was $84,459,215.52, before us it has adopted the district court's figure of $86,313,-600. 362 F.Supp. at 835–38 (Tenney, J.).

government's claim that the transaction was a redemption and concluded that, no matter what value was assigned to the consideration given up by the preferred shareholders and received by Cities in the exchange, "there is every indication that it was substantially less than the face amount of the debentures they received." 316 F.Supp. at 69. The court went on to reject the analogous theory that to permit a deduction would allow Cities to convert nondeductible into deductible expenditures by issuing debentures instead of paying cash to extinguish matured obligations, i. e. calling the preferred by issuing bonds instead of paying cash. *Id.* at 71.

The court further held that the 1947 exchange effected a real alteration in Cities' liabilities since the obligation to pay dividends on the preferred which depended upon earnings and management's good faith exercise of its discretion to declare dividends was converted into an unconditional commitment to pay the face amount of the new debentures plus 3% annual interest. It held that Cities was entitled to a deduction, but upon which of the two theories urged by Cities the court did not specify. *Id.* at 71–72.

Finally, the court concluded that the sole material fact actually controverted was the value to Cities of the preferred and preference shares received by it in the exchange. As to this, it stated that the minimum was the value of the original consideration received when the shares were issued, $45,323,846; but that the actual value to Cities could be determined only after consideration of all relevant data, including the market value of the shares, the financial condition of Cities at the time of the exchange, its profits prospects and expert opinion. The court noted that while the market

price of the shares would be relevant, it was not conclusive. Accordingly, a trial was ordered solely on the issue of the value to Cities of the preferred and preference stock at the time of the exchange. *Id.* at 72–74.

On the second round in the district court—on the government's second motion for summary judgment—Judge Wyatt reaffirmed Judge Mansfield's determination and denied the motion. 330 F.Supp. 421.

The third round in the district court was a bench trial before Judge Tenney on the issue previously ordered by Judge Mansfield to be tried. On that issue, Cities claimed the value it received on the exchange was the original consideration paid in for the preferred, $45,323,-846; the government claimed that the value was the aggregate face amount of the debentures, $115,246,950. Judge Tenney held that the value to Cities of the preferred and preference stock received on the exchange was its fair market value, $86,313,600.[9] 362 F.Supp. at 838. Judgment was entered for Cities based on the discount theory.[10]

Both sides have appealed. The time for filing briefs was extended to await the Supreme Court's decision in Commissioner v. National Alfalfa Dehydrating & Milling Co., 417 U.S. 134 (1974).

On this appeal, the government argues that *National Alfalfa* holds that there can be no deductible bond discount when a corporate taxpayer issues debentures for its outstanding preferred stock. Cities argues that the Court's decision does not preclude such a deduction; that the amount it received for the debentures was the amount originally paid in for the preferred, $45,323,846, or, in the alternative, the fair market value of the preferred, $86,313,600; and that the dis-

9. This was the figure which Cities had contended, in its papers before Judge Mansfield on its original motion for summary judgment, was the fair market value of the preferred and preference stock. Neither party disputed it at trial.

10. Judge Tenney noted that Cities apparently had abandoned its theory of loss through

retirement of its debentures. *Id.* at 835. His judgment computation is based only on a debt discount amortization theory. See Treas.Reg. § 1.163–3(a), (c)(1) (1968). On appeal, Cities claims that it did not abandon its loss theory.

trict court erred in excluding pre-1953 amortization from the tax refund.

## II. DEDUCTIBILITY OF DEBT DISCOUNT

Debt discount typically results from the sale by an issuer of its debt obligation on the market at an issue price below the face amount of the obligation. The difference is referred to as the discount.

■ Although no provision of the Internal Revenue Code in so many words allows a deduction for debt discount, it is settled that such discount is amortizable and deductible over the life of the indebtedness if the debt obligation was issued for cash. *National Alfalfa, supra*, 417 U.S. at 143–46; Chock Full O' Nuts Corp. v. United States, 453 F.2d 300, 301–02 (2 Cir. 1971); Treas.Reg. § 1.163–3(a)(1) (1968). The Supreme Court has not decided the general question whether deductible debt discount results when bonds have been issued for property other than cash. *National Alfalfa, supra*, 417 U.S. at 146. The decisions of other courts on this issue are split. See cases cited *id.* at 146–47. Our Court, however, has held that such a deduction is allowable at least where the bonds were issued for tangible property. Nassau Lens Co. v. Commissioner, 308 F.2d 39 (2 Cir. 1962).

In the instant case, Cities issued new debentures for its own outstanding preferred stock. The face amount of these debentures equalled the aggregate of the stated value, accrued dividends and call premiums on the preferred. The government argues before us, as it did in the district court, that, since none of these items—excess of stated value over original consideration,[11] dividends or call premiums—would have been deductible by Cities had it paid cash for the preferred, to allow a deduction here would permit a taxpayer to convert non-deductible into deductible expenditures by the simple expedient of issuing debentures or bonds instead of paying cash for its preferred.

In effect, the government says that we must look at the transaction as if cash had been paid and the preferred had been redeemed. The district court rejected this analogy. 316 F.Supp. at 71. In view of the Supreme Court's decision in *National Alfalfa,* we agree with the district court and affirm its determination in this respect.

The corporate taxpayer in *National Alfalfa* issued 18-year 5% sinking fund debentures, each $50 debenture to be exchanged for one share of outstanding $50 par 5% cumulative preferred (callable at the time of the exchange at $51). The holder of each share of preferred also received a warrant to purchase one-half share of common at $10 per share in lieu of a $10 dividend arrearage on the preferred. The taxpayer claimed a deduction under Int.Rev.Code of 1954, § 163(a), 26 U.S.C. § 163(a) (1970), for amortizable debt discount measured by the difference between $33 per share, the asserted market value of the preferred on the date of the exchange, and $50, the face value of the debentures. The taxpayer urged the Supreme Court to look to the "economic realities" of the transaction to determine whether deductible debt discount resulted from the exchange. The taxpayer contended that, if it had gone into the marketplace and issued $50 debentures for $33 in cash and then had used those funds to purchase its outstanding preferred, it would have been entitled to a deduction for debt discount in amount of $17 per debenture. In rejecting this contention, the Court reasoned that:

> "[I]t would require rejection of the established tax principle that a transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred . . . ." 417 U.S. at 148.

Since the taxpayer in fact had not gone into the market and had not acquired the funds to purchase the preferred, the

---

11. Referring to Cities' contention that the issue price of the debentures was the original consideration paid in for the preferred.

Court was unwilling to speculate as to what would have occurred had it done so.

The government's argument in the instant case is essentially the same as it urged in *National Alfalfa*. It asks us to view the exchange as if Cities had paid cash for the preferred and preference stock it received. But Cities would have obtained such cash only through the hypothetical venture into the marketplace which the Court rejected in *National Alfalfa*. Cash in fact was not paid here. We decline the government's invitation to postulate the tax consequences of the exchange on a hypothetical cash transaction which never occurred.

■ As Justice (then Circuit Judge) Marshall pointed out in Nassau Lens Co. v. Commissioner, *supra*, 308 F.2d at 44:

> "Surely a promise today to pay $150,000 in ten years is not presently worth $150,000 either in property or cash."

In the instant case, Cities in 1947 promised to pay $115,246,950 in thirty years plus 3% annual interest. This promise cannot be equated with an actual cash payment of that amount in 1947. We hold that the tax consequences of the exchange must be determined on the basis of what actually occurred and not what might have occurred. Cummings v. Commissioner, 506 F.2d 449, 454 (2 Cir. 1974), cert. denied, 421 U.S. 913 (1975) (Smith, J., concurring).

We turn now to the government's more forceful argument based on what actually occurred here: the exchange of Cities' debentures for its outstanding preferred. This corresponds closely to what occurred in *National Alfalfa*. The Court's statement of the issue there is substantially what is before us here:

> "[W]hether debt discount arises where a corporate taxpayer issues a debt obligation in exchange for its own outstanding preferred shares." 417 U.S. at 147.

In *National Alfalfa*, the Court held that the transaction there involved did not result in debt discount deductible to the taxpayer. The government would have us read that decision so broadly that debt discount may *never* result from the exchange by a taxpayer of its debentures for its own outstanding preferred stock. We decline to do so.

■ In *National Alfalfa*, the Court focused on the economic similarity between bond discount and stated interest. It noted that there had been some confusion as to whether such discount was properly characterized as "interest paid for the use of money" or "loss resulting from the funding operation." It concluded that "the relevant inquiry in each case must be whether the issuer-taxpayer has incurred, as a result of the transaction, *some cost or expense of acquiring the use of capital.*" 417 U.S. at 147 (emphasis added).

The Court held that the taxpayer there had not incurred any additional cost for the use of capital by its exchange of $50 5% debentures for $50 5% preferred shares. The principal amount and interest rate on the debentures and the preferred were the same. The sinking fund provisions of both were comparable. The amount originally paid in for the preferred equalled the principal amount of the debentures—the ultimate obligation. The preferred was obtained merely by cancelling the $50 obligation per share on its equity account and transferring that amount to its debt account. As the Court observed:

> "The cost of the capital invested in the corporation was the same whether represented by the preferred or by the debentures, and was totally unaffected by the market value of the shares received at the time of the issuance of the debentures. Accordingly, while recognizing the alteration which did occur in the corporation's capital structure, we conclude that the substitution by [the taxpayer] of its debentures for its previously outstanding preferred, without more, did not create an obligation to pay in excess of an amount previously committed, or establish the base upon which debt discount can arise." 417 U.S. at 154.

The government argues here that Cities' balance sheet reflects a similar substitution. When Cities issued its new debentures and entered them on its balance sheet as debt, it cancelled in its equity account $58,690,000 representing the stated value of the preferred and $19,661,150 representing a reserve for dividends passed before 1938. The balance of the $115,246,950 face amount of the debentures resulted from a debit to its earned surplus account. The government says that all that occurred was a shift from Cities' equity account to its debt account and that no additional cost was incurred in retaining the old capital.

Cities argues, on the other hand, that it did incur additional cost since it became unconditionally liable to repay $115,246,950 for which it originally had received only $45,323,846. Although on the exchange the face amount of the debentures equalled the aggregate call price of the preferred, this amount did not represent a matured obligation of the company prior to the exchange since the exercise of the call option rested in the discretion and good faith of management. The preferred had no legal claim on the earned surplus for the difference before the exchange. They did have such a claim afterwards.

In *National Alfalfa*, the Court emphasized that the fact that a fixed obligation replaced an uncertain one was not alone enough to establish the additional cost required to give rise to deductible bond discount. The critical fact that distinguishes that case from the instant one is that all that occurred there was the substitution of one fixed $50 obligation for another. Moreover, the corporate taxpayer actually had received $50 in cash for the preferred at the time of its issuance. It neither paid nor obligated itself to pay more than the $50 it originally had received. To allow the corporation a tax deduction for repayment of any part of these funds—funds which it in fact had received—would have resulted in a windfall.

As we read *National Alfalfa*, the original consideration is the *minimum* value to be assigned to the preferred received in exchange for the debentures. 417 U.S. at 141–42. See Erie Lackawanna R.R. Co. v. United States, 422 F.2d 425, 430 (Ct.Cl.1970); Missouri Pacific R.R. Co. v. United States, 427 F.2d 727, 734 (Ct.Cl.), modified, 433 F.2d 1324, 1325–26 (Ct.Cl.1970), cert. denied, 402 U.S. 944 (1971). In short, where the original consideration equals the face amount of the debentures, no discount can arise since their issue price equals their face amount.

In the instant case, there is no such equality. The face amount of Cities' debentures far exceeds both the stated value of the preferred and the original consideration paid in at the time of issuance. In order to retain the use of the capital represented by its preferred and preference stock, Cities incurred an additional cost[12] through replacement of an uncertain (or perhaps non-existent) obligation, i. e. the stated value of the preferred, with a fixed one *of greater amount*, i. e. the face amount of the debentures.

To the extent that the district court below allowed a deduction for debt discount resulting from the exchange by Cities of its debentures for its own preferred stock and to the extent that the court specified the original consideration

---

12. In *National Alfalfa*, the Court also held on the facts there presented that no additional capital had been acquired. 417 U.S. at 152. While additional capital might be said to have been acquired here because the market value of the preferred as found by the district court exceeded both its stated value and the original consideration paid for it, clearly no adjustment to the asset side of Cities' balance sheet was made nor could one have been made. Moreover, the Court expressly rejected the relevance of the market value of the preferred in *National Alfalfa* because the taxpayer did not have to go into the market to acquire the stock. While recognizing this surface similarity between *National Alfalfa* and the instant case, we hold that it is not a controlling factor in the instant case in view of the Supreme Court's emphasis that the inquiry should focus upon the *additional cost incurred* rather than upon the *additional capital acquired.*

paid in for the preferred as the floor for determining the value of the debentures at the time they were issued, we affirm.[13]

## III. APPROPRIATE MEASURE OF DEBT DISCOUNT

Having held that Cities incurred an additional cost for the use of capital by its exchange of preferred stock for debentures, we turn now to the issue of the appropriate measure of that cost.[14]

The Court in *National Alfalfa* stated the economic basis for debt discount:

"The economics underlying discount is that it is an adjustment of the difference between the interest prescribed in the instrument issued and the prevailing market rate for money, and it arises because the prescribed rate is too low to sell the obligations at par in that market." 417 U.S. at 150.

Where bonds are issued for cash in the open market, the marketplace determines this adjustment. But where the transaction is insulated from the market, as in *National Alfalfa*, there are no market forces to perform the evaluation process.

In *National Alfalfa*, the Court was disturbed chiefly by two related facts: first, the claimed fair market value of $33 per share for the preferred was the product of an extremely thin market and, second, there was no guarantee that this price for the preferred bore any relation to the fair market value of the bonds which had been issued. Since the transaction had been insulated from the market, the taxpayer in effect was asking the Court "to speculate about the market price and value to the corporation of the debentures in question had they been sold upon the open market." 417 U.S. at 148. There was no

proof that the discount claimed by the taxpayer had been fixed by anything other than an arbitrary determination by the corporate directors:

"[T]here is no evidence of what the fair market value of the bonds was at the time of their issuance. Other factors that would have to be considered would include [the taxpayer's] financial condition at the time of the exchange, including both its credit position and its profits prospects, and the availability and cost of capital in the general market as well as from its preferred shareholders. Normally, the market itself performs this evaluative process. Aside from the fact that the transaction was insulated from the market processes, there has been no attempt here to show that the discount rate was determined with a view toward accounting for these several factors rather than simply having been predicated on the par value of the preferred." 417 U.S. at 151.

In the instant case, Cities argues that its exchange was quite different from that in *National Alfalfa*. Here the exchange was not insulated from the market since the preferred shares were widely held and actively traded on the Boston Stock Exchange and the New York Curb Exchange. Moreover, the instant exchange took place only after hearings and scrutiny by the SEC and after bargaining with the preferred shareholders. Cities points out that the aggregate fair market value of the preferred at the time of the exchange, $86,-313,600—as arrived at by its expert and accepted by the court below, 362 F.Supp. at 835–38 (Tenney, J.)—is the product of an evaluation of those factors outlined by the Court in *National Alfalfa*. 417 U.S. at 151.

Part IV of the *National Alfalfa* opinion, 417 U.S. at 151–55, dealt with the issue of whether the corporate taxpayer by the exchange had incurred an additional cost for the use of capital. This is the issue to which the preceding section of our opinion is addressed. Pages 1285–1289, *supra*.

---

**13.** See note 2, *supra*.

**14.** This is the issue to which part III of the *National Alfalfa* opinion is addresed. 417 U.S. at 147–51. Mr. Justice Stewart concurred in part III (as well as parts I and II), but not in part IV.

■ Assuming this to be so, the critical deficiency in the record before us is the absence of any finding as to the market value *of the debentures* at the time of their issuance. This is indispensable to measuring the debt discount. The sole issue determined on the third round in the district court below was the value to Cities of the preferred and preference stock received on the exchange. 362 F.Supp. at 835–38 (Tenney, J.). This was the sole issue ordered for trial on the first round in the district court. 316 F.Supp. at 74 (Mansfield, J.). Since *National Alfalfa* was decided by the Supreme Court subsequent to the district court decisions below, we have the benefit of hindsight in holding that the appropriate question for the district court to answer, in order to measure debt discount, is what was the market value of the debentures at the time of the exchange, rather than the value to Cities of the preferred it received.

In *National Alfalfa*, the Court made clear that the relevant inquiry in determining bond discount is the market value of the debentures when issued. True, an equivalence in value of the debentures and preferred shares might be assumed if the debentures were issued for cash and/or property in the marketplace. But it should be noted that the opinion in *National Alfalfa* dealt separately with the fair market value of the preferred and the fair market value of the debentures involved in that exchange. 417 U.S. at 149–50. Any assumption of an equivalence of the debentures and the preferred is unjustified where the transaction is insulated from the marketplace since the market forces which normally would bring about an equivalence of the two are absent. Here there is no proof that the two were equal. The Court's

observation in *National Alfalfa* is applicable here: "[T]here has been no demonstration that the difference between the [fair market value of the preferred] . . and the face amount of the debentures is attributable to debt discount." 417 U.S. at 151.

The amount of debt discount must be determined by reference to a market evaluation and not a private transaction. The issue for determination by the district court here is that indicated by the Court in *National Alfalfa* :

"[T]he market price and value to the corporation of the debentures in question had they been sold upon the open market." 417 U.S. at 148.

Accordingly, we reverse and remand to the district court for determination of this issue.[15]

For the guidance of the district court, we wish briefly to comment on certain evidence in the instant record relevant to the issue to be determined on remand. Unlike the situation in *National Alfalfa*, the issue to be determined here is not a matter of speculation.[16] Here both the preferred and debentures were being traded at the time of the exchange. On May 27, 1947, the day prior to the exchange, the aggregate closing market price of the preferred was $104,827,450. Contrary to the implication of the district court that this market price is irrelevant because it was dependent on the value of the consideration to be received in exchange for the stock, 362 F.Supp. at 837, we suggest that for this very reason it is relevant to the determination of the market value of the debentures at issuance. The closing price of the debentures on the date of their issuance was 91⅞,[17] or an aggregate market price of $105,883,135. We suggest that both of

---

15. Since the market value of the debentures at the time of the exchange is the issue to be determined, rather than the value received by Cities on the exchange, we also reject Cities' contention that the original consideration paid in upon issuance of the preferred, $45,323,-846, is the figure to be used in determining debt discount. Original consideration is a minimum, not a maximum.

16. Indeed, if it were a matter of speculation only, *National Alfalfa* would require us to reverse and remand with instructions to dismiss.

17. This figure, apparently through a printer's error, is stated to the "71⅞" in the published district court opinion. 316 F.Supp. at 66. The figure appears correctly as "91⅞" in the original filed opinion.

these figures may be relevant to the determination of the market value of the debentures at the time of their issuance. Which of these two measures (or what combination of them) is more appropriate presumably will depend in part on which market was less thin. That determination, among others, is for the district court.

On this appeal it is not for us simply to choose one or the other. Rather, it is for the district court to determine what is the best available market assessment of the value of the debentures at issuance. As indicated in *National Alfalfa,* where there is no available market evaluation, the district court's inquiry might include consideration of the taxpayer's "financial condition at the time of the exchange, including both its credit position and its profits prospects, and the availability and cost of capital in the general market as well as from its preferred shareholders." 417 U.S. at 151. No such inquiry would appear to be required here since a market assessment of these factors is available.[18]

**18.** Such an inquiry, however, might be required if the district court determined that both markets were too thin to provide a market evaluation of the debentures. Of course, the facts underlying such a determination must be such that the district court's decision is not the sheer speculation that *National Alfalfa* condemned. See note 16, *supra.* While we recognize that the line dividing speculation from the proper evaluation of market value in the absence of a market evaluation on occasions may be unclear, we leave its development to future cases.

**19.** Int.Rev.Code of 1954, § 163(a), 26 U.S.C. § 163(a) (1970) [formerly Int.Rev.Code of 1939, § 23(b), 26 U.S.C. § 23(b) (1952)]. See note 2, *supra.*

**20.** Int.Rev.Code of 1954, §§ 446, 461(a), 26 U.S.C. §§ 446, 461(a) (1970) [formerly Int. Rev.Code of 1939, §§ 41, 43, 26 U.S.C. §§ 41, 43 (1952), respectively].

**21.** Treasury Regulation § 1.163–3 (1968) provides in pertinent part:

"§ 1.163–3 Deduction for discount on bonds issued on or before May 27, 1969

(a) Discount upon issuance. (1) If bonds are issued by a corporation at a discount, the net amount of such discount is deducti-

## IV. AMORTIZATION OF DEBT DISCOUNT

■ Finally, we turn to the propriety of the district court's exclusion, in computing the deduction to be allowed to Cities for the years 1953 and 1954, of amortization of debt discount attributable to the pre-1953 years. Cities did not claim on its tax returns for the years prior to 1953 a deduction for amortization of discount resulting from the issuance of the debentures in 1947. For the reasons below, we affirm the district court's exclusion of such amortization of debt discount for the pre-1953 years.

The issue presented is essentially one of accrual accounting. It involves the interplay of Section 163(a) of the Internal Revenue Code of 1954 [19] on the one hand and Sections 446 and 461 of the 1954 Code [20] on the other.

Section 163(a) provides:

"There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness."

The Treasury Regulations currently in effect, Treas.Reg. § 1.163–3 (1968),[21]

ble and should be prorated or amortized over the life of the bonds . . . .

\* \* \*

(3) Deduction upon repurchase. (1) . . . if bonds are issued by a corporation and are subsequently repurchased by the corporation at a price in excess of the issue price plus any amount of discount deducted prior to repurchase, . . . the excess of the purchase price over the issue price adjusted for amortized . . . discount is a deductible expense for the taxable year."

Treasury Regulation § 1.163–3 first appeared in substantially this form in 1968. T.D. 6984, 33 Fed.Reg. 19175 (Dec. 24, 1968). Prior thereto, debt discount was dealt with in Treasury Regulation § 1.61–12(c)(3), 26 C.F.R. § 1.61–12(c)(3) (1958 rev.), adopted in 1957. T.D. 6272, 22 Fed.Reg. 9424 (Nov. 26, 1957).

Tax treatment of debt discount under the Internal Revenue Code of 1939 was provided for in § 39.22(a)–17 of Regulations 118, 26 C.F.R. § 39.22(a)–17 (1953 rev.), replacing § 29.22(a)–17 of Regulations 111, 26 C.F.R. § 29.22(a)–17 (1949 ed.). This was the pertinent regulation in effect for 1953; it also applied to 1954 by virtue of Internal Revenue Code of 1954, § 7807(a), 26 U.S.C. § 7807(a)

dealing with the tax treatment of debt discount are substantially similar to those in effect in the tax years in question. See Chock Full O' Nuts Corp. v. United States, *supra,* 453 F.2d at 302. The regulations provide not only for annual amortization of debt discount, but also for an adjustment in the year of retirement by repurchase in order to close out the artificial accounting charge allowed for debt discount amortization.

The district court here computed the deductible amounts for 1953 and 1954 by combining the annual amortization of debt discount attributable to debentures outstanding at the end of each year plus the difference between the repurchase price of the debentures retired each year and their issue price (based on its finding as to the value of the preferred to Cities). The court excluded discount on the retired debentures attributable to years prior to 1953 but not claimed by Cities in those years.

Cities argues that this was error. It contends the regulations provide that in the year of repurchase a deduction is to be allowed for the difference between the repurchase price and the issue price, less any amount actually deducted in prior years. If no deduction was taken, so the argument goes, this amount should be included in the adjustment allowed in the year of repurchase. Cities' claim in short is that debt discount may be amortized and deducted over the life of the debentures or it may be recovered in the year of premature retirement through repurchase (or, as a logical extension of this, even at maturity).

While Treasury Regulation § 1.163–3 arguably is susceptible of the interpretation urged by Cities, we reject it as contrary to the intent of the statute. Section 446 provides that the method of accounting used in computing taxable income shall be that under which the taxpayer's books are kept unless that method "does not clearly reflect income." Section 461(a) provides in pertinent part:

"The amount of any deduction . . . allowed . . . shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income."

Under these two sections, "the object to be attained is the clear reflection of income for the taxable period . . . ." Planet Line, Inc. v. Commissioner, 89 F.2d 16, 17 (2 Cir. 1937); see Lucas v. North Texas Lumber Co., 281 U.S. 11, 14 (1930).

 At all times here relevant Cities kept its books and filed its federal income tax returns on an accrual basis. With respect to stated interest accruing on indebtedness over a term of years but payable only at maturity, a taxpayer on an accrual basis may not deduct the full amount in the year of payment but must claim annual deductions of the interest as it accrues. Planet Line, Inc. v. Commissioner, *supra;* Miller & Vidor Lumber Co. v. Commissioner, 39 F.2d 890 (5 Cir.), cert. denied, 282 U.S. 864 (1930); 2 Mertens, The Law Of Federal Income Taxation § 12.95, at 351 (Zimet & Barton rev. 1967); cf. United States v. Anderson, 269 U.S. 422 (1926). The Supreme Court has recognized the economic resemblance be-

(1970), and Treasury Regulation § 1.0–1(b) (1954), which provided for the continuance in effect of certain regulations under the Internal Revenue Code of 1939 until superseded by new regulations under the Internal Revenue Code of 1954.

Treasury Regulations 118, § 39.22(a)–17(c), provided in pertinent part:

"If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds. If the corporation purchases any of such bonds at

a price in excess of the issuing price plus any amount of discount already deducted, the excess of the purchase price over the issuing price plus any amount of discount already deducted (or over the face value minus any amount of discount not yet deducted) is a deductible expense for the taxable year."

See generally Commissioner v. National Alfalfa Dehydrating & Milling Co., *supra,* 417 U.S at 143 & n.7; Montana Power Co. v. United States, 232 F.2d 541, 546–48 (3 Cir.), cert. denied, 352 U.S. 843 (1956).

tween discount and stated interest. Commissioner v. National Alfalfa Dehydrating & Milling Co., *supra*, 417 U.S. at 147; United States v. Midland-Ross Corp., 381 U.S. 54, 57, 66 (1965). We see no reason to treat discount differently from interest. To allow a deduction for the entire amount of the discount in the year of retirement would not "clearly reflect" the taxpayer's true income. Helvering v. Union Pacific Co., 293 U.S. 282, 288 (1934); Planet Line, Inc. v. Commissioner, *supra*, 89 F.2d at 17. In short, a taxpayer that uses the accrual method of accounting must amortize debt discount and take deductions annually over the life of the indebtedness.

Here Cities failed to deduct the amortizable discount for the years prior to 1953 in its returns for those years. We hold that it may not take advantage of that failure in its returns for 1953 and 1954.[22] The deduction for debt discount must be taken in the years to which it is attributable—as Judge Wisdom aptly put it, "not in the year when the taxpayer decides that it is convenient or good business" to accrue the discount. Guardian Investment Corp. v. Phinney, 253 F.2d 326, 330 (5 Cir. 1958).

We affirm the district court's exclusion of amortization of debt discount attributable to the pre-1953 years.

## SUMMARY

The following is a summary of our essential holdings:

(1) Cities' exchange of its debentures for its outstanding preferred stock resulted in a deductible debt discount.

(2) The appropriate measure of that debt discount is the market value of the debentures at the time of their issuance, not the value of the preferred to Cities at the time of the exchange.

(3) Cities is not entitled to a deduction for 1953 and 1954 of amortization of debt discount attributable to the pre-1953 years, since it did not claim such a deduction in its pre-1953 returns.

Affirmed in part; reversed and remanded in part.

J. JOSEPH SMITH, Circuit Judge (dissenting):

I dissent. My brother Timbers' analysis for the majority is quite impressive, yet it seems to me to run counter to the essential thrust of *National Alfalfa*, particularly part IV thereof, considered in the light of the Public Utility Holding Company Act of 1935, pursuant to which the transaction here under review was structured. That Act was thought necessary to simplify the corporate structures of the companies involved, so that investors, rate-makers and consumers could determine with some hope of accuracy the underlying values involved.[1] It recognized that market values of securities throughout the corporate pyramids were even for those days unusually unreliable.[2] The restructuring was an attempt, under court supervision, to simplify structures in a manner as fair as could be to and between the various classes of security holders. There was here in the restructuring of Cities Service no raising of new capital but merely reshuffling of the old. The "costs" to

---

**22.** Treas.Reg. § 1.461–1(a)(3)(i) (1957), formerly Treasury Regulations 118, § 39.43–2, under the Internal Revenue Code of 1939.

Cities' remedy was to file a claim within the applicable period of limitation, see Int. Rev.Code of 1954, §§ 6511, 6532, 26 U.S.C. §§ 6511, 6532 (1970), for credit or refund of any overpayment of tax for those years, rather than for 1953 and 1954. Treas.Reg. § 1.461–1(a)(3)(i) (1957). See also Int.Rev. Code of 1954, § 7422, 26 U.S.C. § 7422 (1970).

**1.** *See* Conference Report and Statement of the Manager on the part of the House on the Public Utility Holding Company bill (S. 2796), 79 Cong.Rec. 14600ff (1935).

**2.** *See* the Act, Title I § 1(b)(1): "when such securities are issued on the basis of fictitious or unsound asset values having no fair relation to the sums invested in or the earning capacities of the properties. . . ."

the corporation do not have sufficient reality to base a tax credit effect, even if we could with confidence agree on comparative "values" of different classes of securities substituted under the plan.

I would reverse for dismissal of the action.